# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jonathan Corbett<br>*Plaintiff*<br><br>v.<br><br>Andrew M. Cuomo, *in his official capacity as Governor of the State of New York*,<br>*Defendant* | Case No. 20-CV-4864 (LGS)<br><br>**FIRST AMENDED COMPLAINT** |

## INTRODUCTION

1) Since March 2020, every state in the United States has been battling infections by a virus known as "SARS-CoV-2" (hereafter, "coronavirus") which causes the disease called COVID-19.

2) By count of infections and deaths, New York state was hit among the first and by far the hardest of any of the states; there is no argument that the disease has not presented a serious public health concern.

3) While New York has largely "flattened the curve" (that is, there has been a decrease in daily infections and deaths from a peak seen in the past), there are still 646 new infections per day within the state (average over the last 7-day period available at time of filing), and likely tens of thousands of individuals remain infected within the state's borders.

4) Notwithstanding, in a move that has no documented basis in public health science whatsoever, Defendant Andrew M. Cuomo ("CUOMO"), as Governor of New York, has ordered that those arriving to New York from states with "high" per capita daily infection rates or positive virus test rates as a percentage of all tests be subject to mandatory quarantines under penalty of large fines and arrest, to be enforced by "inspectors."

5) Plaintiff Jonathan Corbett ("CORBETT"), an attorney, is currently traveling and plans future travel between New York and states that are currently on, or are likely to be added to, CUOMO's list of states subject to the quarantine, and challenges the Governor's order as a violation of his federal constitutional rights under the guarantees of substantive due process found in the Fifth and Fourteenth Amendments, as well as a violation of his right to remain silent as the government attempts to force travelers to fill out questionnaires for the purpose of enforcement of the quarantine.

## PARTIES

6) Plaintiff CORBETT is a natural person with a residence in New York City. CORBETT is a California-licensed attorney representing himself in this matter.

7) Defendant CUOMO is the Governor of the State of New York and is sued here in his official capacity.

## JURISDICTION & VENUE

8) Personal jurisdiction is proper because all parties work and, upon belief, reside, within the State of New York.

9) Subject matter jurisdiction is proper because the claims arise under federal constitutional law. *See* 28 U.S.C. § 1331.

10) Venue is proper because the governmental conduct of which Plaintiff complains is likely to affect him within the boundaries of this district.

## ALLEGATIONS OF FACT

### Section I: Overview of the Coronavirus Outbreak

11) Coronavirus is a pathogen first found to be affecting humans at some point in 2019.

12) The first known appearance of the virus was in China, after which it spread both west to Europe and east to the United States.

13) Infections in the United States first appeared in Washington State in January and then New York in March.

14) Within one month of New York's first case, all 50 states reported infections of coronavirus.

15) It is no surprise that New York City, with its dense population and close contact in its massive public transportation system, became a hotspot of infections.

16) By end of March, New York reported nearly 100,000 infections and over 2,000 deaths, far surpassing any other state and most countries in the world.

17) New York saw its peak of coronavirus deaths on April 7th, 2020, having reported <u>799</u> New Yorkers passed away from the virus on that date.

18) Since then, coronavirus deaths in New York have rapidly declined to <u>27</u> reported June 22nd, 2020, a 96.6% reduction from peak.

19) A total of just under 400,000 New Yorkers, or 4.7% of the population, have tested positive for coronavirus as of the date of the docketing of this lawsuit – in addition, of course, to those who are positive but untested.

20) Indeed, there are likely several times 400,000, as according to a state study concluded on June 13th, 2020, 13.4% of the state's population tests positive for antibodies to coronavirus[1].

---

[1] Announced during the Governor's June 16th, 2020 daily press conference.

21) Extrapolating, this means 1,125,000 residents have been infected – a number that would be made even higher by taking into account the high false-*negative* rate for antibody tests.

22) Elsewhere in the country, perhaps as a result of lower population density, less reliance on public transportation, or otherwise, the rate of infection in most other states started more slowly.

23) Now, however, other states are seeing increases in infection rates, with some somewhat higher than New York.

24) Considering the last 7 days of available data at the docketing of this lawsuit, the following states have seen the following average number of new infections per day:

    a. New York – 646, or 7.69 per 100,000 residents

    b. California – 4,216, or 10.67 per 100,000 residents

    c. Nevada – 359, or 11.95 per 100,000 residents

    d. North Carolina – 1,331, or 12.69 per 100,000 residents

    e. Washington (State) – 409, or 5.37 per 100,000 residents

### Section II: The Challenged Executive Order

25) On June 24th, 2020, CUOMO, during an official press conference and speaking in his official capacity as Governor of New York, announced an executive order that would require all travelers from states that he determines have sufficiently high rates of infection would be subject to mandatory 14-day quarantine.

26) The stated purpose of the order was to reduce the risk of an increase of infections in New York.

27) A written version of CUOMO's order was published to his official Web site and is attached as **Exhibit A** to this First Amended Complaint.

28) The quarantine order states that it applies to travelers who visited states "with a positive test rate higher than 10 per 100,000 residents, or higher than a 10% test positivity rate, over a seven day rolling average."

29) The order applies both to out-of-state visitors and in-state residents returning from a "problem state."

30) The order provides for a fine up to $10,000 and forcible quarantine – a/k/a "arrest" – for those violating the quarantine.

31) CUOMO also announced during his June 24th press conference that those violating the order would also be liable for the cost of the forcible quarantine.

32) It is unclear whether CUOMO plans to forcibly detain violators in a jail, a hospital, or otherwise; however, the state's Department of Health has indicated that a 4.5-day hospital stay on average costs $10,400 in this state[2], while City of New York's Comptroller has indicated that a day on Riker's Island costs $925 per day[3] – meaning that either way violators should expect another 5-figure bill in addition to the loss of liberty and fine.

33) During a media interview in the hours following the announcement of the challenged order, CUOMO stated that he would have "inspectors" conducting "calls" to those incoming from other states[4].

---

[2] "Statistical Brief #10." N.Y. DOH Office of Quality and Patient Safety Division of Information and Statistics. https://www.health.ny.gov/statistics/sparcs/sb/docs/sb10.pdf (Published July 2015, Retrieved June 29th, 2020).

[3] "New York City Jail Costs Reach Record Level."  The Wall Street Journal. https://www.wsj.com/articles/new-york-city-jail-costs-reach-record-level-11575833362 (Published December 8th, 2019, Retrieved June 29th, 2020).

[4] "Cuomo doubles down on COVID-19 hotspot traveler quarantine." WHEC. https://www.whec.com/coronavirus/cuomo-doubles-down-on-traveler-quarantine/5771995/ (Published June 25th, 2020, Retrieved June 29th, 2020).

34) A rational inference must be made that CUOMO intends to create a system of tracking the comings and goings of people at the state's border in order to facilitate the "inspection" that he intends to use to enforce the order.

35) CUOMO has begun ordering travelers arriving by air[5] to fill out forms indicating their personal information, including the New York address to which they are traveling, health questions, and questions about their employment.  *See* **Exhibit B**.

36) The form purports to require *even travelers who have not come from a state subject to the quarantine* to fill out such details.

**Section III: Discussion of Lack of Real or Substantial Relation Between Order & Purpose**

37) Unlike an isolation or "lockdown" order, the purpose of which is to prevent *intra*community spread – that is, to keep people within a community from infecting each other – the purpose of a medical quarantine is to prevent *inter*community spread – that is, to prevent an area from being infected with an outside contagion.

38) However, given that New York currently has tens of thousands of infected citizens already walking around within its borders (who are not subject to quarantine), it is impossible for a quarantine to accomplish its traditional purpose of preventing intercommunity spread.

39) This is because a quarantine to keep coronavirus *out* of New York is too late – the virus is already here, there, and everywhere, from the Hamptons to Niagara Falls.

40) It is also impossible for a quarantine to act as a barrier to intracommunity spread at this point, given that the small number of people who may actually travel to New York with an active

---

[5] It is unclear whether or not travelers arriving via other means are yet being targeted to fill out the same form.

infection would be statistically insignificant in comparison to the large number already here (and not subject to quarantine).

41) That is, if New York already has, *e.g.*, 50,000 people walking around with active infections, if that number increases to 51,000 because of infected incoming travelers, it is unclear to what extent, if any, that will put New York at additional risk of "un-flattening its curve."

42) Indeed, given that CUOMO's order discourages travel in both directions, it is not clear that the number of active infections in New York would increase at all, since unwittingly infected New Yorkers would be just as likely to leave as unwittingly infected out-of-staters would be to arrive[6].

43) The infection rates of the states subject to CUOMO's order is only marginally higher, making it irrational to treat those who visited those states as pariahs in comparison to New York residents.

44) That is, in a group of 10,000 New Yorkers and 10,000 North Carolinians, statistically, about 1 person will be positive in each group (0.769 in the N.Y. group, 1.269 in the N.C. group).

45) Such a statistically-insignificant difference simply cannot lead to a conclusion that treating the groups differently is necessary.

46) CUOMO has not put forth any statements of public health officials, studies, or any other scientific data to demonstrate the expected efficacy or the immediate need for the challenged order.

---

[6] The government has not identified how many infected people CUOMO's order will purportedly prevent from walking the streets of New York.  Given that domestic travel is decimated and international travel is nearly non-existent, and that people who are symptomatic with coronavirus are highly unlikely to travel, and that people who develop symptoms once in New York are highly likely to remove themselves from public notwithstanding the executive order, Plaintiff expects that the Governor's order will actually have *de minimus* impact on reducing infections from the streets, yet dramatic impact on uninfected individuals.

47) The rationality of CUOMO's order is further called into question by the fact that it does not apply to those coming from foreign countries, even when those countries have a far greater rate of infection than any U.S. state, which may lead a rational person to conclude that the true motive behind CUOMO's order is a political dispute between the states.

48) The rationality of CUOMO's order is further called into question because the criteria for inclusion on the problem state list leads to highly undesirable anomalies.

49) For example, by considering the diagnosed rate per capita, CUOMO's order discourages other states from conducting testing, because fewer tests lead to fewer diagnoses per capita – a move which would be highly deleterious to the public health of those states.

50) As another example, by considering the percentage of positive tests, New York would penalize a state for implementing a policy that would provide for additional testing of those most likely to be at risk of infection, because that would increase their "percent positive."

51) Obvious better criteria for inclusion exist, such as deaths per capita over a rolling 7-day average, given that statistics on deaths are far more difficult to manipulate by adjusting testing practices and would only be accomplished by intentionally disregarding acute respiratory death syndrome (ARDS) or multiple organ failure – telltale symptoms of death caused by COVID-19.

52) However, given that New York was the death capital of the world for coronavirus, it is in no position to exclude others based on deaths, and therefore has to use more arbitrary criteria to try to justify excluding others from its borders.

53) The rationality of CUOMO's order is further called into question by the fact that he has agreed to move all of the state to "Phase 2" reopening, a move that is far more likely to result in an increase in infections than allowing the small number of returning residents and out-of-state visitors to arrive without having their freedom curtailed.

54) At the time of filing this First Amended Complaint, New York is scheduled to continue to "Phase 3" reopening in seven days.

55) The rationality of CUOMO's order is further called into question by his inclusion of Washington State, which has *fewer* per capita new coronavirus infections than New York.

56) The rationality of CUOMO's order is further called into question by his exclusion of major league baseball players from the quarantine order[7].

57) The rationality of CUOMO's order is further called into question by his support for mass gatherings for the purpose of protesting – a constitutional right on no greater level than the right to travel – and in fact has had another coronavirus-related order enjoined by a federal court appearing to be moved by an inability to reconcile the order with the support for protests. See *Soos v. Cuomo*, No. 20-CV-561 (N.D.N.Y, June 26th, 2020).

58) CUOMO has cited no evidence that there is any scientific consensus, or even likelihood, that the means here will accomplish any public health goal.

59) There exist far less intrusive means by which CUOMO could accomplish his stated goal. For example, travelers could be checked for temperature upon arrival at a *de minimus* cost. Or travelers could be required to get a coronavirus test at their own expense and, upon negative result, be freed from any quarantine requirements.

### Section IV: Application & Injury to Plaintiff

60) CORBETT is currently traveling in California and Nevada and plans to return to New York within the next 10 days.

---

[7] "Yankees, Mets exempt from Gov. Cuomo's new coronavirus quarantine rule for tri-state area." Newsday. https://www.newsday.com/sports/baseball/coronavirus-quarantine-mlb-yankees-mets-new-york-new-jersey-connecticut-1.46073731 (Published June 24th, 2020, Retrieved June 29th, 2020).

61) CORBETT is also booked to travel to Florida in approximately 3 weeks, again returning thereafter to New York.

62) Further, CORBETT regularly travels to other states, having flown approximately 100 domestic, interstate flights in the last 5 years, the majority of which were between New York and either Florida or California, and CORBETT intends to continue to do so in 2020.

63) Florida, North Carolina, and Washington State were among the states that CUOMO named as meeting his criteria for high rate of infection, and he made clear that any state that increases their infection statistics to his threshold will be added to the list.

64) Although California and Nevada were not enumerated by CUOMO as currently having high enough infection rates, both states saw a substantial increase of new cases over the past 7 days in comparison to the previous 7 days and appear to have just met CUOMO's 10 per 100,000 criteria; thus, they are both likely to be added to the list of states from which a quarantine applies before CORBETT returns to New York.

65) CORBETT maintains a residence within the State of New York at which he intends to stay immediately following his journeys.

66) Being subject to a 14-day quarantine would cause substantial injury to CORBETT's personal and business affairs, including loss of business and limiting his ability to service his law clients.

67) CORBETT wishes to exercise his right to remain silent as to the health questionnaire now required by the government of incoming travelers.

## CLAIMS FOR RELIEF

### Count 1 – Fifth/Fourteenth Amendment to the U.S. Constitution
### *Right to Travel Under Due Process Clause*

68) The Due Process clauses of the Fifth Amendment to the U.S. Constitution as incorporated against the states by the Fourteenth Amendment, and of the Fourteenth Amendment itself, prohibit the interference with the right to travel without due process of law.

69) Under these clauses, the Constitution allows for curtailment of this right, in the context of protection of public health, only if there is a "real or substantial relation" between the *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905).

70) While temporary quarantines have in the past been upheld as constitutionally sound in the context of a public health crisis, the quarantine at issue, which puzzlingly seeks to prevent the introduction of a pathogen that has already been widely distributed within the area the quarantine seeks to protect, is perhaps a matter of first impression (perhaps because it has never before been attempted).

71) There is little or no discernable benefit to creating a quarantine to protect an area that is already widely infected.

72) On the other hand, a deprivation of liberty for a 14-day period under penalty of more severe sanctions, when easily-accomplished, minimally-invasive, and more effective alternatives exist, is a severe interference with the constitutional rights of CORBETT and the people.

73) CUOMO has therefore infringed or announced his intention to cause the state to infringe upon CORBETT's substantive due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

## Count 2 – Fifth/Fourteenth Amendment to the U.S. Constitution
### *Right to Remain Silent*

74) Under the Fifth Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment, the people have the right to refuse to bear witness against themselves; to remain silent.

75) By ordering travelers to answer questions about their comings and goings, work, *etc.*, under penalty of being detailed/forcibly quarantined, the government is attempting to force travelers, including CORBETT, to speak.

76) The government may not pretend that the context is non-criminal and therefore not subject to the Fifth Amendment, by describing the process as a civil means of enforcing the public health, given that it is actually threatening to take the liberty of those who do not cooperate with the quarantine order.

77) CORBETT will nearly certainly be asked to fill out such a form shortly, and intends to refuse to do so citing his right to remain silent.

78) CUOMO has therefore infringed or announced his intention to cause the state to infringe upon CORBETT's right to remain silent under the Fifth and Fourteenth Amendments to the U.S. Constitution.

## Count 3 – Fourth/Fourteenth Amendment to the U.S. Constitution
### *Unlawful Seizure*

79) Under the Fourth Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment, the people have the right to be free from unlawful restraints upon their liberty.

80) By ordering travelers to answer questions about their comings and goings, work, *etc*., under penalty of being detailed/forcibly quarantined if they refuse, the government is threatening to seize individuals if they do not do something they have no obligation to do.

81) Such a seizure would be absent consent, warrant, probable cause, reasonable suspicion, or any exception that might save such a seizure from the realm of the unconstitutional.

82) CORBETT will nearly certainly be asked to fill out such a form shortly, and intends to refuse to do so citing his right to remain silent.

83) CUOMO has therefore infringed or announced his intention to cause the state to infringe upon CORBETT's right to be free from unlawful seizure under the Fourth and Fourteenth Amendments to the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

i. Declaratory relief stating that CUOMO's quarantine order discussed herein is facially unconstitutional.

ii. Injunctive relief ordering that CUOMO and his agents be restrained from enforcing the quarantine order discussed herein and restrained from issuing substantially-similar orders.

iii. Cost of the action.

iv. Reasonable attorney's fees[8].

v. Any other such relief as the Court deems appropriate.

Dated: New York, NY   Respectfully submitted,

June 29th, 2020

_____/s/_____
Jonathan Corbett, Esq.
Plaintiff (attorney proceeding *pro se*)
CA Bar #325608
958 N. Western Ave. #765
Hollywood, CA 90029
E-mail: jon@corbettrights.com
Phone: (310) 684-3870
FAX:   (310) 684-3870

---

[8] To the extent that attorney's fees are available to an attorney representing himself, and in the event that CORBETT retains counsel other than himself.